STATE EX REL. PITTSBURGH COAL COMPANY OF WISCONSIN, Respondent, vs. PATTERSON, City Clerk, Appellant.

*February 20—March 9, 1909*

(1) Certiorari: *Practice: Findings of fact.* (2, 3) *Sales: Delivery f. o. b. cars: When title passes.*

1. Upon *certiorari* to review proceedings of a *quasi*-judicial body involving matters of fact determinable upon evidence, formal findings of fact and conclusions of law are not necessary, the theory of the proceeding being that the evidence reasonably admits of a finding but one way, and that contrary findings are errors of law and jurisdictional.
2. In case of an executory contract for the sale and delivery of chattels f. o. b. cars at a particular point, if nothing appears to the contrary the intention of the parties is presumed to be that the title shall pass upon such delivery.
3. Under a contract for the sale of coal to a railway company, providing that it should be delivered from the docks free on board cars on the vendee's tracks and be paid for according to weights there determined, and that at all times until so delivered it should be at the risk of the vendor subject to ordinary handling,.

it is *held* to have been the intention of the parties that the title should pass when the coal was delivered on the cars as stated; and the words "deliver" and "delivery" in certain provisions of the contract relating to the accumulation of the requisite stock of coal upon the docks before the close of navigation are *held* to have been used only in the sense of delivery for the purpose of rendering the vendor competent to make the final delivery contemplated by the contract.

APPEAL from a judgment of the circuit court for Douglas county: ·A. J. VINJE, Circuit Judge. *Reversed.*

For the year 1907 the *Pittsburgh Coal Company of Wisconsin* had in its possession on its dock at Superior, Wisconsin, $82,000 worth of coal. Such property, in due season, was placed on the assessment roll of the city of Superior for taxation for such year as the property of, or as properly assessable to, said company. Thereafter such company seasonably made application to the board of review of the city of Superior to have the assessment expunged from the assessment roll upon the ground that the company was neither the owner of said coal nor the agent for the owners. At the same time it submitted to said board due proof that the coal was on its dock for delivery to the Great Northern Railway Company, the Northern Pacific Railway Company, and the Chicago, St. Paul, Minneapolis & Omaha Railway Company, a particular proportion thereof having been set aside to be delivered to each such company pursuant to three several contracts, one being with each of said companies, of which the following copy of contract with the Northern Pacific Railroad Company is a sample:

"Whereas, the Coal Company is engaged in the business of selling coal of the variety known as 'Pittsburgh,' and whereas the Railway Company desires to purchase of the Coal Company fifty thousand (50,000) tons of such coal, screened over three-quarter (¾) inch screens at the mines, it is agreed, therefore,

"First. The Coal Company agrees to furnish the Railway Company fifty thousand (50,000) tons of best quality bitu-

minous coal of the variety known as three-quarter (¾) inch thin vein Pittsburgh, mined during the year 1906, the same to be handled and loaded on cars from such docks as may be mutually agreed upon by the Coal Company and the Railway Company, and delivered free on board cars on the tracks of the Northern Pacific Railway Company at Superior, Wisconsin, or Duluth, Minnesota, said coal to be screened over three-quarter (¾) inch bar screen at the mines and to be free from dust and other impurities, the same to be delivered in such quantities and at such times as may be required by the Railway Company, from the date of this contract to July 1st, 1907, but the Railway Company agrees to take delivery in as nearly equal monthly proportions as may be practicable based on its requirements.

"Second. The movement of the coal from the mines shall commence at once and the entire tonnage contemplated under this contract shall be stored on dock or docks as hereinbefore provided on or before the close of navigation on the great lakes for the season of 1906, unless by mutual consent in writing of the parties, a portion of the tonnage contracted for be allowed to come forward after the opening of navigation on the great lakes in 1907, it being understood that the coal is to be stored and cared for on docks at the head of Lake Superior until the end of this contract, viz., the first day of July, 1907, if the Railway Company should so elect.

"The Coal Company agrees that representatives of the Railway Company shall have at all times free access to the mines from which said coal is to be mined and to the vessels and docks, for the purpose of inspection at the mines of the coal, and on vessels or docks of the method in which it is or will be handled, and the Coal Company agrees that it will make good and pay to the Railway Company all damage it may sustain by reason of the coal not being of the kind and quality provided for in this agreement when delivered on its cars subject to ordinary handling, and the Coal Company hereby agrees to give due and timely notice in writing if desired to the representative of the Railway Company of the names of the vessels on which said coal is shipped in order that they may be enabled to make due inspection of the same and the manner of handling such coal, and the Coal Company

agrees to furnish the Railway Company, as directed, statements showing car numbers and weights, the mine and grade of each car loaded on vessels. After such notice and inspection such cargo, if accepted by the Railway Company, shall be duly stored and delivered under the terms of this agreement.

"It is further agreed that representatives of the Railway Company shall have free access at all times to the scales over which the coal contemplated by this contract is being weighed and any inaccuracies discovered in the weight of the coal shall be immediately rectified.

"Fourth. The Coal Company hereby agrees that the entire tonnage contemplated under this contract is to be kept entirely separate from any other coal which may be stored on the dock contemplated by this agreement, whether the property of the Coal Company, or coal being stored by them for others.

"Fifth. In consideration of the delivery of said coal in accordance with the terms of this contract, the Railway Company agrees to pay to the Coal Company therefor, the sum of two dollars and eighty cents ($2.80) per net ton of two thousand (2,000) pounds, and to pay at such rate for the coal delivered in any month during the month following that in which such delivery takes place.

"Sixth. It is further agreed that in case the Coal Company should fail to deliver on the docks the full amount of coal of the quality and kind provided within the time stipulated between the date of this contract and the close of navigation on the great lakes for the season of 1906, the Railway Company may, by written notice served upon the Coal Company within thirty (30) days after the first day of December, 1906, require the Coal Company to deliver a quantity of such coal equal to the amount remaining undelivered under the terms of this agreement, and the Coal Company agrees that it will make such delivery as the exigencies of the Railway Company may demand until the full amount called for by this contract is delivered, such delivery to be made during the closed season of navigation at St. Paul, Minnesota, or Superior, Wisconsin, at the option of the Coal Company."

The application was further supported by evidence given before the board to the effect that the coal was placed on the

docks, part for each of the railway companies heretofore mentioned, in all respects as provided for in the contracts, and was considered accepted when placed in the coal piles on the dock; that as the coal was unloaded it was not put directly into the care of the vendees; that after it was so set aside the respective purchasers had jurisdiction over it. There was considerable evidence indicating performance of the contract according to its terms.

The application was denied. Thereupon the proceedings before the board were, pursuant to a writ of *certiorari,* duly carried to the circuit court for Douglas county for review. In disposing of the matter in such court formal findings of fact were made in accordance with the contract and indisputed proofs presented to the board, with conclusions of law to the effect that the coal was not subject to assessment in the city of Superior for 1907, because the property belonged to the three railway companies under the contracts before mentioned, the same being held by such companies for use in the operation of their railroad business, and that the assessment of said property to the coal company and refusal of the board of review to strike the assessment from the assessment roll were illegal. The decision of the board was reversed and a judgment ordered and in due form rendered, from which this appeal was taken.

For the appellant there was a brief by *Thomas E. Lyons* and *T. L. M'Intosh,* and oral argument by *Mr. Lyons.*

For the respondent there was a brief by *Grace & Hudnall,* and oral argument by *H. H. Grace.*

MARSHALL, J. A question of practice is suggested as to whether it was proper for the trial court to close the controversy by formal findings of fact and conclusions of law, in form as in case of a trial of an equitable action. Strictly speaking, no such proceedings were necessary. The *certiorari* only presented questions of law. The theory upon which a proceeding of a *quasi*-judicial body, involving matters of

fact determinable upon evidence, is challenged for judicial review, is that such evidence does not reasonably admit of a finding but one way and that contrary findings are errors of law and that such errors are jurisdictional as regards such bodies. *State ex rel. Augusta v. Losby,* 115 Wis. 57, 90 N. W. 188; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 100 N. W. 1048; *State ex rel. J. S. Stearns L. Co. v. Fisher,* 124 Wis. 271, 102 N. W. 566.

The question at issue here turns on the contract. If according thereto the coal, upon being delivered on the dock in separate piles, corresponding to the contracts, did not become the property of the respective railway companies, but the transition of title was intended to occur only upon the property being loaded upon cars to be shipped out to such companies, then it was assessable to respondent, and the judgment must be reversed.

The evidence taken before the board of review, aside from the written contracts, was and is valuable only as showing that the coal, at the time of the assessment, had only reached the stage, in execution of the contracts, of segregation into specific lots upon the dock to await delivery on cars as called for.

It is elementary that, in case of an executory contract for the sale of personal property, when the title passes is matter of intention to be determined from the agreement; by its letter where there is no ambiguity, and, otherwise, by its letter in the light of such circumstances as may properly be considered in aid of determining the intention by rules for judicial construction. Generally speaking, in case of an executory contract to sell and deliver personalty, nothing in the statute of frauds interfering, when there is nothing left to be done on the part of the vendee or vendor, or the latter and the vendee jointly, and the chattels have been set aside and appropriated to the contract, the amount thereof and price all settled, the title passes, but such passing may, never-

theless, wait upon change of possession, even though the price
has been agreed upon and paid, or upon the doing of some-
thing after transition of possession. Such passing may occur,
leaving the amount of property and the amount of money to
be paid, yet to be ascertained, or any other of many things
that might be stated, according to the intention of the par-
ties embodied in the sale contract. These principles are so
elementary that we will not take time and space to enlarge
upon them or specify the many circumstances that have been
held to indicate an intention to pass title in advance of change
of possession.

The contracts in question each contain two groups of fea-
tures. The first and fifth clauses make a plain agreement
for a sale of coal delivered from the dock f. o. b. cars there,
the same to be paid for according to weights there deter-
mined, at a specific price per net ton of 2,000 pounds. There
would be little room for controversy but that, if there was
nothing in the contract to indicate to the contrary, the inten-
tion of the parties was to have title pass at the time of such
determination of quantities and delivery.

The general rule is, nothing appearing to the contrary,
that in case of an executory contract for the sale and delivery
of chattels f. o. b. cars, at a particular point, the intention
of the parties is presumed to be that the title shall pass upon
such delivery occurring. In *Vogt v. Schienebeck,* 122 Wis.
491, 100 N. W. 820, this court said, referring to many au-
thorities to that effect, that "a sale f. o. b. cars means that
the subject of the sale is to be placed on cars for shipment
without any expense or act on the part of the buyer, and that
as soon as so placed the title is to pass absolutely to the buyer,
and the property be wholly at his risk, in the absence of any
circumstances indicating" a different purpose. That was re-
ferred to with approval in *Fromme v. O'Donnell,* 124 Wis.
529, 103 N. W. 3, the court holding that a sale for an agreed
price f. o. b. cars at a stated place, must, unless controlled by

some other feature of the sale contract, unmistakably show an intention to pass title to the subject of the sale upon delivery thereof, free of expense, to the vendee on cars at the designated place, under the general rule that, nothing appearing efficiently to the contrary, "as between vendor and vendee the title to the subject of the transaction passes from the one to the other when the terms of the sale are agreed upon and everything the vendee has to do with the matter has been done."

The second group of features in the contracts, upon which respondent must rely to control the first, relates to acts of the vendor, or the vendee and vendor conjointly, creating the physical competency of the former to respond promptly to requests for performance of the final act, to wit: delivery of coal f. o. b. cars at the dock, not only as to having the requisite stock to draw from, as to each particular vendee, but as to such stock being of the kind called for by the agreement.

The second clause relates to the time of accumulation of the stock in storage on the dock, and opportunity of representatives of the vendee to inspect at the mine and otherwise the coal proposed to be accumulated, for certainty that the stock approved at the mine should actually reach the particular pile on the dock set aside to be delivered from in final performance, indicating, unmistakably, a purpose to approve of the stock before transportation thereof by cars from the mine to the vessels used to accomplish the final transit to the coal piles on the dock, and to have the coal so approved, barring damages by negligent handling or other damages not ordinarily incident to proper handling, such as the contract called for.

It contains a further paragraph, regarding the assurance of correct weights, which evidently does not relate to weights at the mine, since it refers to a rectification of mistakes when discovered, which, manifestly, would be inconsequential to the vendees, except as to weight on cars at the final delivery point.

The fourth clause relates to isolation on the dock of the

stock to be drawn from to fill a particular contract, in harmony with the general scheme that the identical coal approved at the mine, and none other, should be used to make final deliveries from, and that competency to make such deliveries should not be impaired by dealings of the vendor with others.

The sixth and last clause of the contract contains a stipulation as to accumulation of the requisite stock of coal on the dock set aside by itself to accommodate the contract, in case of failure to do so before the close of navigation. The words "deliver" and "delivery" are used, but not in the sense of final delivery; only in the sense of delivery for the purposes of competency to make the final delivery mentioned in the first clause.

There is little, if anything, in the second group of features indicating that they have to do with anything except preparation for final delivery f. o. b. cars at the dock, provided for in the first clause.

The idea that the parties intended the title to pass to the vendees at any instant prior to the consummation of the final act of delivery, is negatived by the second paragraph of the second clause, to the effect that the coal at all times, till delivered on cars at the dock, shall be at the risk of the vendor subject to ordinary handling.

We cannot escape the conclusion that the parties contemplated that the transition of title to the coal should wait upon placing the same on cars at the dock, and doing everything in that regard suggested by the term "free on board cars;" that loss of coal prior to that time, by any means other than ordinary handling, would fall on the vendor.

Little help is afforded in a case of this sort by precedents. It is governed by familiar principles of law and by the particular intent, evidenced by the particular contract, in the light of its own peculiar circumstances. Perhaps if precedents were needed, *Miller v. Seaman,* 176 Pa. St. 291, 35 Atl. 134, is as near analogous to this, as to facts, as any case which

can be readily found.   The sale was of specific piles of lumber located in a lumber yard, to be inspected, measured, and paid for, f. o. b. cars at the yard, and so delivered as ordered, provided that if not all ordered within a specific time, the balance to then be inspected and measured on the yard and paid for.   Before all of the lumber was ordered out part of it was carried away by a flood.   It was held that the lumber so carried away was the property of the vendor, as title by the contract was not to pass in advance of delivery f. o. b. cars as agreed upon.

*By the Court.*—The judgment is reversed, and the cause remanded with directions to render judgment affirming the decision of the board of review.